COMMONWEALTH *vs.* MICHAEL KING
(and a companion case[1]).

No. 92-P-57.

Berkshire. June 3, 1993. - August 24, 1993.

Present: DREBEN. KAPLAN. & GILLERMAN. JJ

*Constitutional Law*, Search and seizure, Probable cause. *Search and Seizure*, Automobile, Exigent circumstances, Probable cause. *Probable Cause.*

At a hearing on a motion to suppress as evidence certain quantities of cocaine and various drug accessories seized during a warrantless search of the defendants' persons and the automobile they occupied, the judge correctly concluded that the search was lawful under the authority of *Commonwealth* v. *Cast*, 407 Mass 891 (1990), where there was probable cause for the search and at the time the search was conducted the circumstances were exigent. [225-227]

INDICTMENTS found and returned in the Superior Court Department on June 6, 1990.

Pretrial motions to suppress evidence were heard by *Daniel A. Ford,* J., and the cases were tried before *Lawrence B. Urbano,* J.

*Edward J. Spence, III,* for Michael King.

*Michael J. Ripps* for Matthew Juras.

*Paul Caccaviello,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. Michael King and Matthew Juras, codefendants, appeal from their respective convictions of drug offenses.[2] They raise only the question whether the judge of the Superior Court was right in declining, after pretrial hearing,

---

[1]Matthew Juras.

[2]The defendants were indicted for trafficking in cocaine (G. L. c. 94C, § 32E[*b*][2]). After jury-waived trial, King was found guilty of the trafficking, fourteen to twenty-eight grams (G. L. c. 94C, § 32E[*b*][1]); Juras

to suppress as evidence certain quantities of cocaine and various drug accessories, the results of a warrantless police search of their persons and an automobile which they occupied.[3] The judge did not err. We affirm the convictions.

1. The judge made concise findings. We state their elements in our own words.

For some time in 1989 and early 1990, Officer Lawrence Ordyna of the Adams police department and his colleagues acquired reason to suspect Michael King of drug dealing in the Adams area. In May, 1989, he had pleaded guilty to a drug charge in Adams and in August, 1989, to a drug charge in New York.

An unnamed informer, designated "No. 2," was acquainted with Juras. On April 16, 1990, Juras told No. 2 (and No. 2 told the police) that Michael King and his brother Peter King had collected money for a trip to New York City to buy cocaine and had left the King residence that day at 2:00 P.M. in a white and blue Suzuki Samurai (registered to Peter King, Massachusetts license 565-LPM), intending to return to Adams between 8 and 9 P.M. Ordyna set up surveillance at the King house. The white and blue car, occupied only by Peter King, was spotted that evening pulling into the King driveway. That night Ordyna and another officer did a "roving" surveillance of the house in separate unmarked cars and saw persons going in and after short visits coming out, perhaps indicating drug purchases.

On April 30, Juras told No. 2 that the Kings were collecting money for another trip (Juras suggested that he was buying with or through the Kings). Then on May 1 Juras told No. 2 that the Kings had left for New York at 7 A.M. in the white and blue car and would be returning to Adams. Ordyna arranged for surveillance on Route 8, a common New York-Adams route, starting at 2 P.M. At 2:40 P.M. the

was found guilty of possession with intent to distribute (G. L. c. 94C, § 32A[c]).

[3]The defendants also complained that the official drug analysis certificate carried the stamped signature rather than the handwritten signature of the notary, but the point is foreclosed by Commonwealth v. Johnson, 32 Mass. App. Ct. 355 (1992).

officers sighted the car on that road, with Peter King driving and Michael King the passenger. Later that day Juras told No. 2 he would be receiving cocaine from Michael King and would have it for sale that night. Juras in fact was observed coming to the King house that night in his Pontiac Grand Am automobile (registered to him, Massachusetts license 339-MDP) in company with Michael King; they entered the house, stayed a few minutes, reentered the car, and drove off.

Within a few days of May 1 the police superintended a "controlled buy" of cocaine by No. 2 from Juras at a time and place agreed between them.

The climactic day was May 12. Juras told No. 2 that Michael King would be leaving his residence between 1 and 1:30 P.M. to go to New York to buy cocaine; Juras would be going along, and they would be using Juras's Pontiac; they would return between 8 and 9 P.M. The police set up surveillance at the King house and at 1:29 P.M. observed Juras picking up Michael King in the Pontiac. They headed south onto Route 8. At 8:20 P.M. police on surveillance marked the car headed north on the same route. Police followed the car into Adams, stopped it, ordered Juras (the driver) and Michael King out, and finally, upon search without warrant of the men and the car, found the cocaine and paraphernalia above mentioned.

The defendants conceded that the police had "probable cause" to carry out the search of the car and the persons when it occurred. On its part, the Commonwealth conceded that the seven-hour interval between 1:29 and 8:20 P.M. would have allowed time for seeking and (if justified) procuring a search warrant from a clerk-magistrate or other authority.

Upon his findings of fact, which were well supported, the judge concluded as matter of law that the warrantless search was lawful.[4] He cited *Commonwealth* v. *Cast*, 407 Mass. 891 (1990), as controlling authority.

---

[4]"The judge's findings of fact are binding in the absence of clear error, and we view with particular respect the conclusions of law which are based

2. In *Cast* an informer, claiming acquaintance with Cast, told the police that Cast was able to move large quantities of cocaine on short notice. The informer provided details about Cast and his method of operation; Cast showed a propensity to use expensive automobiles and luxury hotels in carrying out sale transactions. The police corroborated much of the informer's information.[5]

Cast was then approached by the informer, and he agreed to deliver two kilograms of cocaine to the Plymouth, Massachusetts, area on July 30. Watching Cast's home in Bridgeport, Connecticut, on that day, the police observed Cast entering a taxi at 4 P.M., carrying a suitcase. (The use of a taxi was itself suggestive, as Cast had available two cars of his own.) Cast went to an automobile rental agency where he rented a new Lincoln with New York license plates. He placed the suitcase in the trunk of the car.

The police followed the Lincoln on its journey, losing sight of it for some periods of time. It was seen in the vicinity of the Merritt Parkway in Connecticut at 6:30 P.M. A police agent, stationed at a Plymouth hotel, asked the employees there to notify the police if Cast, speaking with a Spanish accent, should call for a reservation. A man, dubiously qualifying by accent, called about 10 P.M., giving the name Richard Sawicki; the police were notified. At 12:30 A.M., July 31, a trooper — one of those previously alerted and stationed along a major route from New Canaan, Connecticut, to Plymouth — saw the Lincoln and followed it toward Plymouth. Finally the car was stopped, and search without a warrant turned up the cocaine.[6]

There was probable cause for the search when it occurred, but how explain the want of the assumed additional constitu-

---

on them." *Commonwealth* v. *Cast*, 407 Mass. 891, 897 (1990). See also *Commonwealth* v. *Sabetti*, 411 Mass. 770, 775 (1992).

[5]We state the *Cast* case in abbreviated form and omit questions about the reliability of the informer.

[6]The search, held valid for the car, was held lawful also for the contents of the closed suitcase. See *Commonwealth* v. *Cast*, 407 Mass. at 901-903. We have no reason in the present case to pursue the car-container problem, recently reconsidered in *California* v. *Acevedo*, 500 U.S. 565 (1991).

tional requirement of a warrant? The court accepted that at that point the circumstances were "exigent" — a warrant could not be secured in time — and the so-called "automobile exception" would dispense with the need for a warrant. *Commonwealth* v. *Cast*, 407 Mass. at 901. But could not a warrant have been applied for and obtained at an earlier stage in the pursuit? The court recognized the validity of contingent or "anticipatory" warrants, issued on a showing that there will be probable cause at the time of their ultimate execution. *Id.* at 906.

The court said, however, that the police were not obliged to seek such a warrant and could rely in the end on the automobile exception and exigent circumstances. *Ibid.*[7] See also *Commonwealth* v. *Killackey*, 410 Mass. 371, 373-374 (1991). The search in *Cast* was held valid under the State and Federal Constitutions. See also *Commonwealth* v. *Wunder*, 407 Mass. 909, 912-913 (1990).

3. To return to the present case, it is congruent in principle with *Cast* although different on the facts. We are dealing with the "automobile exception." Perhaps it was open to the police, say just after the departure of the Pontiac at 1:29 P.M. on May 12, to apply on the basis of probable cause for an anticipatory warrant. But they were not required to do so. At the time of the search in Adams at 8:40 P.M., there was plenty of probable cause, and no attempt had to be made to secure a warrant at that stage because the circumstances were then exigent. The judge said: "The police were entitled

---

[7]The court added that the possibility that police earlier have probable cause and might then secure a warrant does not foreclose their acting later without warrant upon the coincidence of probable cause and exigent circumstances. *Commonwealth* v. *Cast*, 407 Mass. at 906. The court cites *Cardwell* v. *Lewis*, 417 U.S. 583, 595-596 (1974), for the proposition that "exigency may arise at any time and in a number of situations and the fact that police had probable cause and might have obtained a warrant earlier 'does not negate the possibility of a current situation's necessitating prompt police action,' since no principle would foreclose the right of officers to search a motor vehicle on probable cause and exigent circumstances 'if a warrant was not obtained at the first practicable moment[.]' " *Commonwealth* v. *Cast*, 407 Mass. at 906. But see point 3 of our text about the police creating an exigency.

to wait until the last piece of probable cause had fallen into place, and to rely upon the well established automobile exception . . . . [T]he exigency was not created by the officers' own unreasonable delay." (On the latter question, see *Commonwealth v. Forde,* 367 Mass. 798 [1975], and *Commonwealth v. Martino,* 412 Mass. 267, 276-277 [1992]).

4. *Cast* still talks in terms of exigent circumstances, and in the later case of *Commonwealth v. Bakoian,* 412 Mass. 295, 305 (1992), the court said, "We do not suggest that, under Massachusetts law, there is no requirement of exigent circumstances to justify an immediate, warrantless search of an automobile based on probable cause." Our respected neighbor, the United States Court of Appeals for the First Circuit, evidently thinks this no more than a form and holds in these automobile cases, simpliciter, that search is valid if probable cause exists at the time. See *United States v. Panitz,* 907 F.2d 1267, 1271 (1st Cir. 1990).[8]

At all events — whether "exigent circumstances" is or is not recited — justification for holding a warrant to be superfluous is found in the mobility of automobiles and the diminished feeling of privacy people have regarding the interiors of their cars. See *Commonwealth v. Bakoian,* 412 Mass. at 303-304. We may reflect that the former consideration would not necessarily exclude giving a warmer reception to the idea of the anticipatory warrant. (Indeed, are not all warrants contingent or anticipatory? A warrant for the usual search of an apartment does not assume that the drugs will inevitably remain in place to be seized.) And as to privacy, the general-

---

[8]The approach in *Panitz* may perhaps be referred to the great debate over whether the Fourth Amendment to the United States Constitution means that a search without a warrant is *per se* unreasonable and unconstitutional (subject to exceptions), or rather that a search without probable cause is unreasonable and unconstitutional, with the words of the Amendment about warrants being merely a limitation on their issuance. See the survey by Tomkovicz, California v. Acevedo: The Walls Close in on the Warrant Requirement, 29 Am. Crim. L. Rev. 1103 (1992). The author thinks the majority in *Acevedo,* 500 U.S. 565 (1991), while confining its holding to the automobile doctrine, is "on the brink of 'clarifying' Fourth Amendment law at the expense of the warrant requirement." Tomkovicz, *supra* at 1106 (footnote omitted).

izatiion about popular sentiment may be thought too broad to
be useful: what car owner would not think his privacy in-
vaded by a police intrusion for the purpose of making a
search? There is value, too, in requiring the police to get a
warrant: they must disclose what they knew and what they
intended before the fact of a successful search colors their
post hoc justification of probable cause. The law, however,
has followed another path.

*Judgments affirmed.*