## COMMONWEALTH *vs.* VA MENG JOE.

No. 95-P-683.

Suffolk. February 21, 1996. - May 31, 1996.

Present: SMITH, LAURENCE, & LENK, JJ.

Further appellate review granted, 423 Mass. 1111 (1996).

*Arrest. Search and Seizure,* Threshold police inquiry. *Constitutional Law,*
Search and seizure.

An unidentified informant's tip, corroborated by independent police
observations, exhibited sufficient indicia of reliability to provide reason-
able suspicion for police to make an investigatory stop of the defendant
while he was at the wheel of his automobile stopped at a traffic light.
[502-508]

In the circumstances of an investigatory stop police officers were warranted
in conducting a limited protective search of a suspect by reaching into
the suspect's pocket; the seizure therefrom of two plastic bags contain-
ing powder later determined to be heroin was lawful. [508-511]

INDICTMENT found and returned in the Superior Court
Department on December 11, 1992.

A pretrial motion to suppress evidence was heard by *Julian
T. Houston,* J., and the case was heard by *Thomas E. Con-
nolly,* J.

*Robert L. Sheketoff* for the defendant.

*Patricia M. Blackburn,* Assistant District Attorney, for the
Commonwealth.

LAURENCE, J. Va Meng Joe was convicted of trafficking in
heroin in November, 1994. His appeal challenges the denial
of his pretrial motion to suppress the inculpatory drugs, which
were seized from his pocket by a police officer who had run
up to his car while Joe was stopped at a red light. He contends
that the police did not have probable cause to stop and search
him on the basis of a confidential informant's tip and
subsequent police observations. Viewing "the facts and cir-
cumstances as a whole in assessing the reasonableness of the
officers' conduct" here, *Commonwealth* v. *Williams,* 422
Mass. 111, 116 (1996), we affirm the conviction.

At an August, 1993, evidentiary hearing on Joe's motion to suppress, two police officers and a special agent of the Immigration and Naturalization Service (INS), whom the motion judge found credible, testified as follows.[1] Special Agent Reeves of the INS received a telephone call on September 24, 1992, from a confidential informant (CI). Reeves had spoken with CI in the past but had never before used CI as an informant. CI told Reeves that CI had called Joe earlier that day and had ordered two ounces of "China White" heroin to be delivered to CI at a specific doughnut shop on Morton Street in the Roxbury section of Boston later in the day.[2] The delivery was to be made by Joe himself driving alone in a black Mercedes Benz automobile. CI knew Joe (by the alias "David") and had identified him from a photographic array several weeks earlier.[3] Joe was also, according to Reeves, "known to us," although how or why he was so known was never explained.

Reeves immediately conveyed this information to Boston police detectives Morrissey and Grant, experienced members of the Asian organized crime task force. They also "knew" both CI and Joe in some undescribed way. Together the agent and the detectives planned a stakeout of the doughnut shop. Reeves then called CI and reported that "everything was all set up." In three separate vehicles, Reeves, Morrissey, and Grant drove to and parked in the area where the scheduled heroin delivery was to occur. Their surveillance began at

---

[1]The motion judge had made no written findings of fact or conclusions of law prior to the filing of the parties' briefs on this appeal in 1995. Pursuant to this court's orders dated September 27 and October 17, 1995, the judge on November 9, 1995, filed his findings of fact, rulings of law and order on defendant's motion to suppress. Neither side made any objection or comment in response to the filing, though authorized by this court to do so.

[2]The motion judge found that CI had told Reeves Joe would be making the delivery between 3:30 and 4:00 P.M. The transcript of the hearing does not include any testimony regarding the exact time of delivery. Since, however, a coordinated police response was quickly arranged and set up in the area of the doughnut shop by 3:00 P.M., and CI showed up at the shop at the same time, it is a reasonable inference that CI had in some fashion indicated to Reeves the approximate time of anticipated delivery that afternoon. See *Commonwealth* v. *Cast*, 407 Mass. 891, 896 (1990); *Commonwealth* v. *Fleming*, 37 Mass. App. Ct. 927, 928 (1994). Cf. *Alabama* v. *White*, 496 U.S. 325, 331 (1990).

[3]The record is vague regarding the circumstances of CI's prior identification of Joe, except that at the time CI was "under arrest in our office."

about 3:00 P.M. CI was observed standing in front of the doughnut shop making several calls from a pay phone. After 15 to 20 minutes, CI walked across Morton Street and stood by gas pumps at a service station. CI's departure from the doughnut shop was not part of the police plan. Approximately 45 minutes later, Joe appeared, alone, driving a black Mercedes Benz. The car pulled up in front of the doughnut shop and slowed down almost to a stop. Joe appeared to be looking around as if he were meeting someone. He then drove off down Morton Street.

The officers followed Joe's car in their separate vehicles. Reeves became trapped in heavy traffic. Grant and Morissey, however, were close behind Joe when he had to stop at a red light. Grant got out of his car, ran in front of Joe's idling Mercedes, and displayed his badge. Joe then stepped out of his car and stood between the open car door and the driver's seat. Facing Grant, Joe inserted his right hand into his upper left hand pocket. Morrissey, who had by this time run up to the Mercedes to join Grant, saw Joe's hand movement and drew his gun. Grant reached into Joe's upper left hand pocket and pulled out two large plastic bags containing a "tannish" powder that on analysis proved to be 54.20 grams (almost two ounces) of heroin.[4]

The motion judge rejected Joe's argument that these facts did not establish probable cause to stop Joe's vehicle. Evaluating the evidence flowing from the unnamed informant's tip under the "*Aguilar-Spinelli*" standard of probable cause, see *Commonwealth* v. *Cast*, 407 Mass. 891, 896 (1990),[5] the judge concluded that (a) the facts inherent in the tip itself,

---

[4]Joe stipulated that this amount of heroin was not consistent with personal use but was consistent with an intent to distribute. It is unclear from the transcript and the findings whether Grant reached into the pocket before or after Joe removed his hand from it in apparent response to seeing Morrissey's gun. Grant did not testify at the suppression hearing.

[5]When an informant's tip is involved, the State Constitution mandates satisfaction of the twofold standard set forth in *Aguilar* v. *Texas*, 378 U.S. 108 (1964), and *Spinelli* v. *United States*, 393 U.S. 410 (1969). The Commonwealth is required to demonstrate: (1) some underlying circumstances from which the law enforcement officials could have concluded that the information was reliable (the "veracity" test); and (2) some underlying circumstances which demonstrate a basis for the informant's knowledge (the "basis of knowledge" test). "To justify the intrusion of an arrest and search, the tip must not only come from a credible person, but he must be shown to be relying on something more than a casual rumor or an

particularly CI's role in setting up the heroin sale, demonstrated a sufficient basis of personal knowledge (a conclusion not disputed by Joe); (b) although CI had no track record as an informant, the tip was sufficiently detailed to possess "some indicia of reliability"; and (c) the "independent police corroboration of the detailed information provided by the informant established the informant's veracity," particularly since events "unfolded precisely as predicted by the informant."[6]

Joe's essential appellate argument is that the police observations did not sufficiently corroborate the informant's deficient credibility. It confronts us, as so "frequently occurs in search and seizure cases, . . . with line-drawing of a difficult nature." *Commonwealth* v. *Borges*, 395 Mass. 788, 797 (1985) (Hennessey, C.J., concurring). It has been presented to us, however, as it was framed for the motion judge, as a question of the reliability of an unidentified informant's tip in the context of probable cause. That is the test for measuring the

_____

individual's general reputation." *Commonwealth* v. *Avery*, 365 Mass. 59, 63 (1975). However, independent police corroboration of information supplied by an informant can compensate for deficiencies in either or both prongs of the *Aguilar-Spinelli* test and thus satisfy the art. 14 requirement. See *Commonwealth* v. *Upton*, 394 Mass. 363, 374-375 (1985); *Commonwealth* v. *Robinson*, 403 Mass. 163, 164-166 (1988); *Commonwealth* v. *Cast*, 407 Mass. 891, 896 (1990); *Commonwealth* v. *Bakoian*, 412 Mass. 295, 298 (1992). As discussed *infra* at 504, satisfaction of these tests is less demanding in the reasonable suspicion context than when dealing with probable cause. *Commonwealth* v. *Lyons*, 409 Mass. 16, 19 (1990).

[6]Deference to such rulings by a trial or motion judge on a motion to suppress is a fundamental tenet of appellate review. "The evidence before the judge at the hearing on the motions to suppress consisted entirely of oral testimony. The determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw and heard the witnesses, and not of this court. In such a situation, where subsidiary findings of fact have been made by the trial judge, they will be accepted by this court, and we do not substitute our judgment for his, absent clear error." *Commonwealth* v. *Moon*, 380 Mass. 751, 755-756 (1980). Further, it is well-settled that "the judge's findings of fact are 'binding in the absence of clear error . . . and [we] view with particular respect the conclusions of law which are based on them.' *Commonwealth* v. *Correia*, 381 Mass. 65, 76 (1980). While the judge's ultimate findings of fact and rulings of law, as they bear on issues of constitutional dimension, are open for reexamination by this court, such ultimate findings are 'entitled to substantial deference by this court.' *Commonwealth* v. *Bookman*, 386 Mass. 657, 661 n.6 (1982). Questions of credibility are, of course, for the trial judge to resolve. *Commonwealth* v. *Meehan*, 377 Mass. 552, 557 (1979)." *Commonwealth* v. *Bottari*, 395 Mass. 777, 780 (1985). Our decision reflects these principles.

validity of a search and seizure pursuant to a warrant, *Commonwealth* v. *Upton*, 394 Mass. 363, 370, 374-375 (1985), or an arrest, *Commonwealth* v. *Robinson*, 403 Mass. 163, 164-165 (1988), based upon such a tip. Neither the warrant nor the arrest scenario fits the present circumstances.

Rather, based upon the hearing transcript and the judge's findings, what occurred here was a police investigatory stop based upon an informant's telephone tip and subsequent police surveillance. See *Commonwealth* v. *Willis*, 415 Mass. 814, 815 (1993) (whether a police stop is an arrest or a threshold inquiry is a "highly fact-based question[ ]"). The proper focus of our attention, therefore, is whether the tip, as corroborated by independent police observations, exhibited sufficient indicia of reliability to provide reasonable suspicion to make that investigatory stop. See *Commonwealth* v. *Lyons*, 409 Mass. 16, 18-20 (1990); *Commonwealth* v. *Ciaramitaro*, 26 Mass. App. Ct. 110, 113-115 (1988). Cf. *Alabama* v. *White*, 496 U.S. 325, 328-331 (1990). On this record, we conclude that reasonable suspicion existed to justify the stop.[7]

In *Commonwealth* v. *Lyons*, 409 Mass. at 19, the Supreme

---

[7]An appellate court may affirm a ruling on grounds different from those on which the trial or motion judge relied if the correct or preferred basis for affirmance is supported by the record and the findings, even if the parties and the judge did not raise the issue below. See *Beeler* v. *Downey*, 387 Mass. 609, 613 n.4 (1982); *Barry* v. *Commonwealth*, 390 Mass. 285, 299 n.18 (1983); *Commonwealth* v. *Bennett*, 414 Mass. 269, 271-272 (1993). This principle applies to search and seizure cases and motions to suppress. See *Commonwealth* v. *Signorine*, 404 Mass. 400, 403 & n.1 (1989); *Commonwealth* v. *Osorno*, 30 Mass. App. Ct. 327, 332 n.8 (1991); *Commonwealth* v. *Dise*, 31 Mass. App. Ct. 701, 705 (1991). Although the motion judge here raised the issue of viewing the situation as an investigatory stop under *Terry* v. *Ohio*, 392 U.S. 1 (1968), the prosecutor assumed that he had to establish probable cause for the police stop of Joe rather than reasonable suspicion. Defense counsel noted the possible application of *Terry* but also assumed that the Commonwealth nevertheless had to establish "probable cause to justify |the| stop under *Terry* or for any reason." Joe's appeal brief argued only the failure of the facts to support probable cause under the *Aguilar-Spinelli* standard (see note 5, *supra*). He asserted that the "reasonable suspicion" test does not apply here because "the Commonwealth conceded to the motion judge that it had to establish probable cause" while acknowledging, without conceding, that the Commonwealth's "best argument" would be that what occurred here was a valid *Terry* stop. The Commonwealth's brief in fact argued explicitly, as an alternative ground of affirmance, that the stop was a valid investigatory one based on reliable facts giving rise to reasonable suspicion. Joe submitted no reply brief in response to this argument.

Judicial Court set forth the analysis to be employed in determining whether the police had sufficiently reliable information to warrant making an investigatory stop:

"To meet the 'reasonable suspicion' standard in this Commonwealth, police action must be 'based on specific, articulable facts and reasonable inferences therefrom' rather than on a 'hunch.' . . . [I]f the police conduct an investigatory stop based on an informant's tip, our evaluation of the tip's indicia of reliability will be focused on the informant's reliability and his or her basis of knowledge. Independent police corroboration may make up for deficiencies in one or both of those factors. *Because the standard is reasonable suspicion rather than probable cause, a less rigorous showing in each of these areas is permissible.* An investigatory automobile stop requires that the Commonwealth prove that the officer 'has a reasonable suspicion that the occupants have committed, are committing, or are about to commit a crime.' "[8] (Emphasis added.)

There is no question here, as the judge correctly found, concerning CI's basis of knowledge, since CI had set up the heroin delivery by Joe. Such involvement implied the informant's first-hand and direct knowledge rather than the receipt of casual rumor or the implication of Joe because of his unsavory reputation. See *Commonwealth* v. *Cast*, 407 Mass. at 893, 896; *Commonwealth* v. *Rivera*, 29 Mass. App. Ct. 290, 293 (1990); *Commonwealth* v. *Fleming*, 37 Mass. App. Ct. 927, 928 (1994).

As to the "veracity" prong of the analysis, it is true that CI had done nothing to establish presumptive reliability, such as providing tips producing prior arrests and convictions, *Commonwealth* v. *Kaufman*, 381 Mass. 301, 302 (1980), or seizures of contraband, *Commonwealth* v. *Perez-Baez*, 410 Mass. 43, 46 (1991). CI's tip nevertheless reflected first-hand information from a known informant about a pending drug deal involving both the defendant and the informant. That

[8]See also G. L. c. 41, § 98, providing that police officers "may examine all persons abroad whom they have *reason to suspect of unlawful design,* and may demand of them their business abroad and wither they are going" (emphasis added).

factor weighed in favor of CI's credibility, *Commonwealth* v. *Bakoian*, 412 Mass. 295, 301 (1992); *Commonwealth* v. *Rivera*, 26 Mass. App. Ct. at 293, as did the fact that CI was reachable by the authorities. See *Commonwealth* v. *Cast*, 407 Mass. at 898.

Moreover, as the judge also found, the tip contained fairly specific information of the sort not easily obtainable by a casual bystander. Details such as the identity of the drug dealer,[9] the vehicle he would be driving, his exact destination, and the approximate time frame when he would arrive constituted significant indicia of CI's reliability that compare favorably with precedent, particularly under the applicable "less rigorous showing" standard. See *Commonwealth* v. *Anderson*, 366 Mass. 394, 399-400 (1974) (anonymous informant's tip reflected personal knowledge and accurately predicted defendant's movements); *Commonwealth* v. *Cantalupo*, 380 Mass. 173, 174, 176 (1980) (known informant, considered reliable by police, identified defendant as possessing and selling drugs at a certain location); *Commonwealth* v. *Bakoian*, 412 Mass. at 301-302 (known informant's tip identified drug dealers, their vehicle, their destination, and approximate time of arrival); *Commonwealth* v. *Blake*, 23 Mass. App. Ct. 456, 457-459 (1987) (known informant possessing personal knowledge identified defendant as dealing cocaine from a particular car and predicted when and where the activity would take place); *Commonwealth* v. *Rivera*, 29 Mass. App. Ct. at 293 (known informant set up drug deal with defendant, described automobile to be used, and predicted time and place of arrival); *Commonwealth* v. *Fleming*, 37 Mass. App. Ct. at 928 (reliability of known informant established by his participation in the drug buy, identification of the defendant, and precise predictions as to the time and place of the delivery). Compare *Alabama* v. *White*, 496 U.S. at 332 (anonymous tipster's prediction of identified defendant's future behavior, including how, when and where defendant would conduct narcotics transaction, indicated someone "likely to . . . have access to reliable information about [the defendant's] illegal activities"). Contrast *Commonwealth* v. *Lyons*, 409 Mass. at

[9]Since Joe was already known to the police and had been earlier specifically identified by CI, the absence of the sort of detailed description of physical appearance in the tip, found significant in many of the cases in this area, is irrelevant.

17, 20-21 (no reliability in anonymous tip that defendant "would be heading for Bridgton, Maine" in a particular car with drugs just purchased in Chelsea, which reflected no special knowledge of defendant's affairs and provided only details "obtainable by an uninformed bystander"); *Commonwealth* v. *Carrasquillo,* 30 Mass. App. Ct. 783, 786-787 (1991) (unidentified informant's tip, the source of which was unknown, that defendant had gone to New York City that day and would be returning to his home in Springfield in the afternoon with cocaine and an Hispanic male who was planning to set up a drug distribution system, possessed no indicia of reliability).

Even were there a close question as to the veracity of CI's information, the police surveillance here independently corroborated the tip sufficiently to satisfy the *Lyons* standard. "The police corroboration of such 'nonobvious [and predictive] details' [including the defendant's identity, exact destination, and approximate time of arrival] provided by the informant, prior to investigating the defendant and the vehicle, removed any doubt as to the informant's reliability." *Commonwealth* v. *Bakoian,* 412 Mass. at 302.[10] Police observations verifying a defendant's future expected behavior, particularly his showing up where, when and how predicted by an informant, have been regarded as especially confirmatory of the reliability of the tip in a number of cases. See *Commonwealth* v. *Anderson,* 366 Mass. at 400; *Commonwealth* v. *Robinson,* 403 Mass. at 166 n.2; *Commonwealth* v. *Cast,*

---

[10]The fact that the predicted heroin delivery did not actually take place, presumably because of CI's unplanned removal from the doughnut shop to the gas station, does not weaken the force of the corroboration under the standard we use as a benchmark in measuring the adequacy of corroboration, *Draper* v. *United States,* 358 U.S. 307, 312-314 (1959). See *Commonwealth* v. *Robinson,* 403 Mass. 163, 166 (1988). In *Draper,* the police corroborated all of the known informant's predictions as to the defendant's appearance and manner and time of arrival except, as here, the most inculpatory, the defendant's actual possession of the heroin the informant said he would be carrying. The court stated that the confirmation of all of the other aspects of the tip gave the police " 'reasonable grounds' to believe that the remaining bit of [the informant's] information — that [the defendant] would have the heroin with him — was likewise true." 358 U.S. at 313. Cf. *Commonwealth* v. *Rivera,* 29 Mass. App. Ct. at 293 (informant set up buy from defendant but initially did not show up, a circumstance that did not affect the reliability of the tip or the validity of defendant's stop and arrest).

407 Mass. at 898, 899-900; *Commonwealth* v. *Cosme,* 15 Mass. App. Ct. 448, 452-453 (1983); *Commonwealth* v. *Blake,* 23 Mass. App. Ct. at 459; *Commonwealth* v. *Rivera,* 29 Mass. App. Ct. at 293; *Commonwealth* v. *Rosario,* 37 Mass. App. Ct. 920, 922 (1994); *Commonwealth* v. *Fleming,* 37 Mass. App. Ct. at 928. Contrast *Commonwealth* v. *Carrasquillo,* 30 Mass. App. Ct. at 786-787 (police observed defendant's car going in a different direction and toward an apparently different destination than predicted by informant; deemed insufficient corroboration).

Finally, enhancing both the reliability of CI's information and the corroborative effect of the police investigation in this case was Joe's arguably suspicious conduct: slowing almost to a halt in front of the doughnut shop and looking around as if he were meeting someone, then driving off. See *Commonwealth* v. *Wren,* 391 Mass. 705, 707-708 (1986) (officer's observations of suspect's vehicle "traveling very slowly and then speeding up" one of the elements supporting a stop on reasonable suspicion); *Commonwealth* v. *Oreto,* 20 Mass. App. Ct. 581, 586 (1985) (experienced trooper could infer from, inter alia, abnormally slow speed of vehicle, likelihood of drug offense being committed inside car); *Commonwealth* v. *Rosario,* 37 Mass. App. Ct. at 922 (defendant said by informant to be going to sell drugs was observed by police at the location and time predicted to drive up and begin "obviously looking for someone [he] intended to meet" there, a circumstance adding to the verification of the tip). Cf. *Commonwealth* v. *Anderson,* 366 Mass. at 400 (defendant's "acting somewhat suspiciously in looking back over his shoulder [as he walked briskly out of the bus terminal] . . . lends some corroborative effect to the facts known to the police"). Observations of a defendant's conduct that would appear innocent or ambiguous to the casual onlooker can "take[ ] on special significance 'to the trained eye of the officer,' [and] may be relied on by an officer in making his or her assessment" in search and seizure situations. *Commonwealth* v. *Cast,* 407 Mass. at 900.[11]

We conclude that CI's tip and the officers' corroborative

[11]Particularly instructive on this point are *Commonwealth* v. *Rivera,* 29 Mass. App. Ct. at 292-294, and *Commonwealth* v. *Fleming,* 37 Mass. App. Ct. at 927-929. In both cases, as here, an informant had told the police that he had arranged to buy drugs from the defendant at a certain time and

observations satisfied the less rigorous showing required by the reasonable suspicion standard. They provided the police with sufficient specific, articulable, and reliable facts, including the rational inferences the police were entitled to draw from those facts, to justify briefly stopping Joe for a threshold inquiry. The police officers acted neither on hunch nor instinct, but rather with "a particularized and objective basis for suspecting [Joe] . . . of criminal activity." *United States* v. *Cortez*, 449 U.S. 411, 417-418 (1981).[12]

At that point, the officers were entitled to conduct a brief inquiry of Joe "to determine his identity or to maintain the status quo while obtaining more information." *Commonwealth* v. *Caldwell*, 36 Mass. App. Ct. 570, 579, rev'd on other grounds, 418 Mass. 777 (1994), quoting from *Adams* v. *Williams*, 407 U.S. 143, 146 (1972). Joe's subsequent actions in getting out of the driver's seat, standing behind the driver's side door, and reaching into his upper left hand pocket frustrated that limited investigatory inquiry but warranted the police seizure of the incriminating bags of heroin.

The police officers did not (and Joe makes no argument to the contrary) engage in a disproportionate use or show of

---

place. When the defendant in *Rivera* arrived, as predicted by the informant, he twice "looked from side to side," then drove away (the informant not being then in the area), returning shortly thereafter. These were among the "suspicious acts" observed by the police "which provided further corroboration of the tip." The defendant in *Fleming* was observed at the time and place predicted "looking up and down the street" (the informant did not initially show up), a circumstance deemed part of the " 'limited but significant police corroboration.' " See also *Commonwealth* v. *Rosario*, 37 Mass. App. Ct. at 921-922 (informant told of defendant's impending drug sale at particular location; part of police corroboration consisted of observing defendant and companion "looking up and down the street, in all directions, as if they were looking for somebody").

[12]Indeed, "[a]lthough . . . unnecessary to decision of the present case . . . the 'suspicion' reasonably generated in the present case was substantial, rising almost, if not quite to the probable cause that would support an arrest." *Commonwealth* v. *Blake*, 23 Mass. App. Ct. at 460. The level of probable cause was, as noted above, thought by the motion judge to have been attained here. Cf. *Commonwealth* v. *Paredes*, 35 Mass. App. Ct. 666, 668-669 (1993). Even in the probable cause context, judges are enjoined not to deal in technicalities but rather probabilities, "the factual and practical considerations of every day life on which reasonable and prudent . . . [people] act." *Commonwealth* v. *Desper*, 419 Mass. 163, 170 (1994) (citations omitted). Those pragmatic considerations support the judge's conclusions here, under the less stringent reasonable suspicion test.

force. They did not block his car, already stopped at a red light, nor display any weapons as they initially approached the car. Contrast *Commonwealth* v. *Bottari*, 395 Mass. 777, 782 (1985); *Commonwealth* v. *Sanderson*, 398 Mass. 761, 766 (1986). Our law unquestionably recognizes the right of the police, when an investigatory stop is justified, to take reasonable precautions for their own protection, based upon their analysis of the situation they confront and their experience. *Commonwealth* v. *Johnson*, 413 Mass. 598, 600-601 (1992). The issue in evaluating the validity of the police action that discovered Joe's illegal drugs is whether all the circumstances faced by Officer Grant, taken together, were "enough to warrant belief by a 'reasonably prudent man . . . that his safety or that of others was in danger.' " *Commonwealth* v. *Fraser*, 410 Mass. 541, 546 (1991), quoting from *Terry* v. *Ohio*, 392 U.S. 1, 27 (1968). We are persuaded that Grant's reaching into Joe's pocket, which revealed the heroin, was reasonable under that test. Grant's action was undoubtedly a warrantless search, but it was within constitutional limits, being "confined to what was minimally necessary to learn whether the suspect [was] armed." *Commonwealth* v. *Silva*, 366 Mass. 402, 408 (1974). It constituted, as required, a degree of intrusion that was "proportional to the degree of suspicion that prompted the intrusion." *Commonwealth* v. *Borges*, 395 Mass. at 794.

Joe's sudden emergence from his car while stopped in traffic at a red light, with his body partly concealed behind the car door but facing Grant, could reasonably have been considered by the police unexpected, suspicious, and menacing. See *Commonwealth* v. *Santiago*, 30 Mass. App. Ct. 207, 210 (1991); *Commonwealth* v. *Torres, ante* 6, 7-9 (1996). Joe's behavior, in conjunction with the recognized "inordinate risk" every police officer assumes when approaching a vehicle she has stopped, see *Commonwealth* v. *Sumerlin*, 393 Mass. 127, 130, 132 (1984), cert. denied, 469 U.S. 1193 (1985), may well have itself justified a limited search for weapons on Joe's person. See *Commonwealth* v. *Santiago, supra* at 210-211.

We need not, however, rely on those factors alone. Joe's simultaneous act of reaching into his pocket as he confronted Grant realistically transformed the situation into one of imminent threat. It now supported a reasonable police belief that Joe might not only be armed but was also preparing to

pull out a weapon.[13] See *Commonwealth* v. *Fraser*, 410 Mass. at 543, 545-546 (officer saw defendant bend down behind truck, then confront officer with hands in pockets; frisk of pockets for weapon upheld); *Commonwealth* v. *Johnson*, 413 Mass. at 600-601 (officer's observation of defendant reaching into his pants justified search of pants for weapon). Cf. *Commonwealth* v. *Patti*, 31 Mass. App. Ct. 440, 441, 443 (1991) (even though defendant was apparently cooperative and weather was cold, officer could interpret defendant's putting his hands in his pockets late at night in a high crime area as a potential reach for a weapon).

In response to this reasonably perceived threat to safety, Officer Grant did not engage in a general exploratory search for evidence of criminal activity. Nor did he conduct a general frisk of Joe's entire person for possible weapons, as he would have been justified in doing. See *Commonwealth* v. *Owens*, 414 Mass. 595, 600 (1993). Instead, his limited search, of the very pocket into which Joe had thrust his hand, was " 'strictly tied to and justified by' " the circumstances which rendered its initiation permissible." *Commonwealth* v. *Silva*, 366 Mass. at 407, quoting from *Terry* v. *Ohio*, 392 U.S. at 19.

---

[13]Police experience of the frequent association of guns with drug dealing, though not the subject of testimony here, has been noted in appellate decisions. See *Commonwealth* v. *Moses*, 408 Mass. 136, 143 (1990) (approving of motion judge's observations that police are aware that "drug trafficking is fraught with violence," a factor justifying protective search for weapons); *Commonwealth* v. *Rodriguez*, 415 Mass. 447, 451 (1993) (from his experience, police officer understood that "handguns were a danger to law enforcement agents during drug-related searches"). At the suppression hearing, Joe's counsel argued that the officers had not explicitly testified to a concern for their safety or that they thought Joe had been "going for a gun." There is, however, no legal requirement that an officer testify to having been placed in fear by the potential threat, "so long as it is clear that he was aware of specific facts which would warrant a reasonable person to believe he was in danger." *United States* v. *Tharpe*, 536 F.2d 1098, 1101 (5th Cir. 1976) (en banc). See *Commonwealth* v. *Fitzgibbons*, 23 Mass. App. Ct. 301, 306-307 n.5 (1986) ("the officers' concern for their own safety is a fact that can be inferred from all the circumstances; it does not necessarily depend on direct testimony," citing *Commonwealth* v. *Ballou*, 350 Mass. 751, 756-757 [1966], cert. denied, 385 U.S. 1031 [1967]); *Commonwealth* v. *Patti*, 31 Mass. App. Ct. 440, 443-444 (1991) (officer need not testify to fear of safety concern if circumstances warranted search of pocket as safety precaution). The test is an objective one, and Officer Morrissey's immediate reaction to Joe's hand movement — drawing his handgun — speaks more eloquently of police perception of the potential risk than any testimony. See also *Commonwealth* v. *Moses*, *supra* at 142 n.5.

Grant properly "confined his search strictly to what [was] minimally necessary to learn whether . . . [Joe was] armed." *Commonwealth* v. *Silva, supra* at 408. See also *Commonwealth* v. *Robbins*, 407 Mass. 147, 149, 152 (1990) (protective search for weapons that was limited to suspicious object seen in crack in front seat was reasonable).

In this situation, Officer Grant " 'had no more than a few seconds in which to assess the extent, if any, of the danger, and to ascertain the most effective and least intrusive means of protecting himself. *Commonwealth* v. *Sumerlin*, [393 Mass.] at 129-130.' . . . Given the circumstances faced by the officers in this case, they were warranted for their own protection in finding out what [Joe] had concealed inside his [pocket]. Police officers are 'not required to gamble with their personal safety.' " *Commonwealth* v. *Johnson*, 413 Mass. at 601-602.

The fact that the limited, protective search of the pocket yielded not a weapon but illegal drugs was not ground for invalidating the seizure. See *id.* (seizure of incriminating cocaine concealed in defendant's pants, discovered by police who saw him hide something in pants and searched there for a possible weapon, held proper); *Commonwealth* v. *Santiago*, 30 Mass. App. Ct. at 210-211 (frisk of defendant's person by police reasonably concerned that defendant might be armed, which resulted in seizure of potentially incriminating heroin in defendant's pocket, was proper although the case was remanded on other grounds); *Commonwealth* v. *Patti*, 31 Mass. App. Ct. at 440, 443-444 (officer's search of defendant's pocket, out of concern he "might be reaching for a weapon" after defendant put his hands in pockets, which revealed incriminating drugs in pocket, held valid).[14]

"In sum, it is our conclusion that, given these circum-

---

[14]"In most instances" of a limited search for reasonably suspected weapons after an investigatory stop, the search is implemented by a "frisk," i.e., "a pat-down of the outer clothing of the suspect . . . [and] [o]nly after the pat-down gives indication that a weapon is present do the police have the privilege to search further." *Commonwealth* v. *Silva*, 366 Mass. at 408. That "external patting" limitation — which reflected the actual facts in *Terry* v. *Ohio, supra*, 392 U.S. at 29-30 — was not mandated by *Terry* as the invariably necessary first step in every protective search. Nor does it appear to be so, at least where it is reasonably suspected that the weapon is in a specific place on the defendant's person and the search is confined to that very place. Thus, in *Adams* v. *Williams*, 407 U.S. 143 (1972), the investigating officers, who had stopped the defendant's car upon information that he was carrying drugs and "a gun at his waist," immediately reached through

stances, what occurred here was a proper threshold inquiry producing evidence which was justifiably employed in the trial against the defendant. We see no error." *Commonwealth* v. *Anderson,* 366 Mass. at 401.

*Judgment affirmed.*

---

the car window and removed a loaded revolver from his waistband. "[T]he policeman's action in reaching to the [very] spot where the gun was thought to be hidden constituted a limited intrusion designed to insure his safety, and we conclude that it was reasonable. The loaded gun seized as a result of this intrusion was therefore admissible" in evidence against the defendant. *Id.* at 148. That reasoning, dispensing with the ceremonial initial pat-down when the police have reason not only to suspect that the person detained is armed but also to apprehend that he is about to use the weapon against them, is applicable to the limited, focused search by Officer Grant here. See *Commonwealth* v. *Willis,* 415 Mass. 814, 816, 820-821 (1993) (police, in the course of proper investigatory stop of defendant suspected of being armed, were justified in reaching into defendant's pants and removing a gun; the "most important" factor in assessing the reasonableness and proportionality of police intrusion on a defendant's person in such a stop is "the danger to the safety of the officers or the public or both"). Cf. *Commonwealth* v. *Barrett,* 17 Mass. App. Ct. 970, 971 (1984) (police observed what appeared to be outline of a gun in defendant's rear pocket and, upon learning from him he did not have a permit to carry, "reached into Barrett's pocket and seized a .22 caliber derringer"; in "such circumstances, no *Miranda* warning or 'pat down frisk' was required before taking the gun from Barrett"); *New York* v. *Quarles,* 467 U.S. 649, 653, 656, 657 (1984) (because of safety threat, no need to give *Miranda* warnings before asking rape suspect where he had hidden his gun).